COURT OF APPEALS
DECISION
DATED AND FILED

September 17, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP142-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2016CF1720**

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

MARIO KARILL WOOD,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County:  THOMAS J. McADAMS and GLENN H. YAMAHIRO, Judges. *Affirmed*.

Before White, C.J., Donald, P.J., and Colón, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Mario Karill Wood appeals from a judgment of conviction for attempted first-degree intentional homicide as a party to a crime and the order denying his motion for postconviction relief pursuant to WIS. STAT. RULE 809.30 (2021-22).[1] Wood argues that trial counsel was ineffective for failing to file a notice of alibi and pursue that defense at trial. He entered a guilty plea in the middle of trial and argues it would be a manifest injustice if he were not permitted to withdraw his plea. Upon review, we affirm.

## BACKGROUND

¶2 Wood was charged with attempted first-degree intentional homicide, false imprisonment, and armed robbery, each count as a party to a crime, arising out of an incident on December 7, 2015. According to the criminal complaint, Melanie[2] reported to the police that she had been assaulted inside her residence by three individuals: Willie Jordan, a man she had dated; Ariella Webb; and Wood, whom she only knew by a nickname. Melanie was found barely breathing with a syringe sticking out of her arm, while all the gas burners on the stove were on without the flames burning. The residence was ransacked; the missing property included Melanie's purse, $1,000 cash, her cell phone, and her dog. Melanie was taken to the hospital, where a blood test showed the presence of opiates in her blood.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] In accordance with the privacy protections provided in WIS. STAT. RULE 809.86, we adopt the pseudonym for the victim used by the State.

2

¶3      In March 2016, Melanie contacted the police to notify them that she had identified the third perpetrator by looking through photographs of incarcerated individuals using a cell phone application called "Jail Base." Wood was charged in April 2016.

¶4      In November 2016, the circuit court granted Wood's first attorney's motion to withdraw based upon Wood's disagreements with the first attorney about how to handle the case.[3] Wood was appointed a second attorney (trial counsel), who appeared at the remaining pretrial hearings and trial. The State's cases against Wood and Jordan were joined for trial.

¶5      On February 27, 2017, after voir dire and jury selection, trial counsel informed Wood and the circuit court that he represented a family member of Webb, the cooperating co-defendant. Wood told the court that he was concerned that trial counsel would not "represent [him] to the fullest of his power." However, the court concluded that a conflict of interest had not been shown and the case continued.

¶6      The next day, the circuit court discussed a letter from Wood that had been directed to his chambers, but appeared to be addressed to trial counsel. Wood alleged that in the weeks and days before the trial, he had asked trial counsel to file a notice of alibi and counsel refused. Trial counsel informed the court that when he took over the case in November 2016, he reviewed discovery and when he met with Wood by telephone in December 2016 and January 2017, Wood did not ask him to file a notice of alibi defense. Trial counsel stated that at

---

[3] The Honorable Thomas J. McAdams presided over Wood's trial and sentencing. We refer to Judge McAdams as the circuit court.

his last meeting with Wood prior to the trial, on February 22, 2017, Wood definitively asked him to file a notice of alibi. Trial counsel told Wood it was too late.

¶7      Trial counsel informed the circuit court that he met with Wood that morning, February 28, 2017, and they discussed the advantages and disadvantages of an alibi defense, especially in light of Wood's speedy trial demand. Trial counsel stated that he had asked the prosecutor if she would consent to an alibi defense, but she refused. The court then addressed Wood, who stated he would like to proceed to trial that day without the alibi defense. Trial counsel explained to the court that the first attorney's investigator interviewed Wood's mother and girlfriend, and while both offered an alibi for Wood, the stories were inconsistent and neither was irrefutable. After the court questioned Wood thoroughly on his decision to go to trial, the court concluded that the case should proceed.

¶8      The trial proceeded; the State first called the 911 operator who testified about the 911 call requesting medical assistance for Melanie around 2:00 a.m. on December 7, 2015; the call was played for the jury. The State next presented a Milwaukee Fire Department (MFD) lieutenant who testified that he led a team of firefighters who responded to the 911 call, stating that the house smelled of natural gas at entry, which was a concern for lack of oxygen or explosion. Melanie was found unconscious in an upstairs bedroom; the firefighters moved her outside to fresh air. Melanie had a syringe sticking out of her arm. The lieutenant testified that he and the paramedics evaluated her, noting her very low rates of aspiration, and administrated Narcan, to interrupt any opiates. Because she did not respond, the paramedics started an I.V. line and administered three more doses of Narcan before she became responsive. MFD firefighters and paramedics transported Melanie to the hospital by ambulance.

¶9     The State called a Milwaukee Police Department (MPD) officer, who testified that he responded to a battery complaint at the same house where MFD members were responding to the call for Melanie. He testified that he smelled natural gas upon entering the house. While reviewing photographs of the crime scene, the officer identified a heroin needle and syringe cap on the floor. The officer identified photographs of Melanie taken at the hospital showing burn marks at various parts on her body and bruising around both of her eyes.

¶10     The State's next witness was Melanie, who testified that she had been dating Jordan for about six to seven months in December 2015. She had been living with her cousin and with Webb for several months. She was working at Silk gentlemen's club. In December, Jordan gave her a gun, a Glock, but he asked for it back. He called her on December 5, 2015, to say he could not find the gun at her home. She headed home and found Jordan and Webb at her house. Jordan confronted her on the missing gun. Melanie accused Webb of lying about knowing where the gun was and then kicked her out of the house. Jordan also then left, voicing anger about the gun being missing.

¶11     Melanie testified that she scoured her house for the gun the following day, on December 6, but never found it. That evening, around 10:30 p.m., Jordan and Wood[4] arrived at Melanie's house, she let them in, and Jordan confronted Melanie about the missing gun. Jordan threw her to the ground and Wood used duct tape to restrain her, binding her feet and wrists and then binding her arms to her body, and gagging her with a hat. Melanie testified that

---

[4] Later in Melanie's testimony, she described finding Wood on an application called Jail Base, because at the time of the assault, she only knew him by the nickname DoubleR.

she noticed Webb arrived. While Jordan and Wood pointed guns at her, the three punched and spat at her. Melanie noted that Jordan wore white gloves, Wood wore black gloves, and Webb wore yellow rubber dishwashing gloves.

¶12 Melanie testified that while she was bound on the kitchen floor with duct tape and belts, Wood sat on her and Jordan stood over her. Melanie testified that Jordan then heated a fork over the stove and then burned her legs with it, stating he wanted to "play tic-tac-toe because [she] need[ed] a pretty face and body to make money." Jordan burned her at least ten times and he reheated the fork if it was not hot enough to burn her. Melanie screamed for her life and begged him to stop.

¶13 Melanie testified that as she thrashed around, the duct tape and belts came off her legs; she tried to get up to run, but Wood clotheslined her and knocked her over. Jordan dragged her upstairs and put her in the bathtub. Wood then watched Melanie, pointing a gun at her, and told her that she was going to pay for her mistake. Melanie asked to turn on the water in the tub, which she could reach with her still-bound hands. When she was wet, Wood allowed Melanie to get out of the bathtub and change her clothes.

¶14 Melanie testified that Jordan and Webb returned and Jordan laughed at how beaten and swollen she was before he unwrapped the duct tape. Melanie and Jordan spoke alone; Jordan told her he loved her but that she was a traitor. Wood and Webb returned, they again bound her with duct tape, and then Jordan tied up her arm and injected her with the contents of a syringe.

¶15 Melanie testified that the next thing she remembered was waking up in the ambulance screaming for water. Melanie reviewed a photograph taken of her three days later; she stated her injuries included a concussion, two black eyes,

bruises on her neck, facial swelling such that she could not see out of one eye, blood clots in her eyes, and severely burned legs. Melanie testified that she eventually learned that her personal property went missing that day including: her wallet, about $1,000 in cash, her cellular phone, her keys, and her pit bull puppy. She testified that a photograph showed a sweater that she wore during the assault still had duct tape on it. She reviewed photographs of belts that belonged to her, her cousin, and Webb, that were used to bind her as well as the hat used to gag her.

¶16 After a break, trial counsel informed the circuit court that Wood had elected to resolve his case by a plea agreement. The State put the offer on the record: Wood agreed to enter a guilty plea to attempted first-degree intentional homicide as a party to a crime and the State would move to dismiss and read in the false imprisonment count and dismiss entirely the armed robbery count, as well as make a recommendation of a forty-year sentence, evenly bifurcated between initial confinement and extended supervision. The State's recommendation was contingent on Wood testifying truthfully in the trial against Jordan.

¶17 The court questioned Wood about this decision, especially in light of his earlier concern for an alibi defense. Wood informed the court that trial counsel "advised [him] this would be the best decision." Wood stated that after hearing the trial testimony, he thought this would be the best option. The court then conducted a thorough plea colloquy with Wood about the elements of the charged offense, the rights he was waiving by entering a plea, and the consequences of being convicted of this felony. The court confirmed that Wood understood he would be waiving possible defenses—trial counsel stated that they had discussed an alibi defense, but concluded it would not be sufficient. Wood confirmed that the court could use the testimony received so far at trial and the criminal complaint

7

as the factual basis for the plea. Wood entered a guilty plea on the record and the court accepted it.

¶18 The trial continued with the State presenting testimony from medical professionals about Melanie's dangerously low oxygen saturation rate in the ER, testing that showed an opioid overdose, and how she would have likely died without medical intervention.

¶19 Prior to the State calling Wood as a witness, the attorney for his co-defendant, Jordan, informed the court that Wood's trial counsel had represented Jordan in a criminal matter in 2011. Trial counsel did not recall this representation. The circuit court asked Wood whether he would want trial counsel to still represent him during the remainder of the case; Wood said, "No." Wood stated that trial counsel "badgered" him to take a plea he did not want to take in the middle of trial. Wood stated that he did not think trial counsel could represent him after having connections to both of his co-defendants. Trial counsel considered this position to be "game playing" on Wood's part; however, the court allowed him to withdraw as counsel.

¶20 Before the jury, the State discussed Wood's plea agreement. Wood, represented by successor counsel, testified that he did not see Jordan, Webb, or Melanie on the night of December 6, 2015, and was instead home with his girlfriend. However, when the State questioned him about what he told an MPD lieutenant during his debriefing after his plea, he acknowledged he told the police he went to Melanie's house with Jordan and Webb, punched Melanie in the head, helped bind Melanie with duct tape, and held her still while Jordan burned her with a heated fork. Wood confirmed he told police that they brought Melanie to the upstairs bathtub, but he let her exit the tub and put on dry clothes, although he

8

kept a gun pointed at her during that time. Wood acknowledged he told the police that Jordan re-bound Melanie and injected what he understood to be heroin through a needle in her arm. Wood confirmed that he told the police that when he left, Melanie was snoring on the bed, Webb had removed the duct tape from her body, and Wood took her dog with him.

¶21    During cross-examination, Wood testified that he had access to the police reports for over a year, he was not present during this incident, and he was only telling the police what they wanted to hear. The State argued that Wood breached the plea agreement. The State then called the police lieutenant who interviewed Wood and was allowed to play the recording of that interview for the jury.

¶22    While Jordan's trial continued, Wood's case proceeded to sentencing.[5] The State argued Wood breached his plea agreement with his testimony and successor counsel agreed. The court found that the agreement was breached because Wood was not cooperative, did not answer questions, and the State impeached his testimony with the police interview video footage. The circuit court imposed a sentence of fifty years, bifurcated as thirty years of initial confinement and twenty years of extended supervision.

---

[5] The record reflects that Jordan was ultimately convicted and sentenced to a term of eighty years of imprisonment, bifurcated as fifty years of initial confinement and thirty years of extended supervision. *See State v. Jordan*, No. 2019AP2115-CR, unpublished slip op., ¶12 (WI App Dec. 20, 2020).

¶23    Wood moved for postconviction relief in May 2019. He argued for plea withdrawal on the basis of ineffective assistance of trial counsel. The postconviction court granted him a *Machner* hearing on his claim.[6]

¶24    Trial counsel testified at the *Machner* hearing that he did not have an independent recollection of parts of his representation of Wood including the handover of the case and discovery from Wood's first attorney, the investigator's report about Wood's possible alibi defense of being with his girlfriend, the chronology of the pretrial events, speaking with Wood's girlfriend about her alibi for Wood, or delivering his trial file to postconviction counsel. However, trial counsel testified that he spoke truthfully to the circuit court during the trial and therefore, what he said at the time was true. Trial counsel did not remember telling Wood that he would need to turn over both investigative reports, which were inconsistent, if Wood pursued an alibi defense.

¶25    Trial counsel testified that Wood's defense at trial was that he did not do it and Jordan did everything. Counsel stated that his "position was see what happens, see who shows up, see who testifies at trial, because" he thought there was a belief "that the victim would not appear and the State would not be prepared to proceed." Trial counsel testified that the victim appeared, testified, and her testimony was "astounding."

¶26    Trial counsel testified that he believed that Wood came forward with the alibi defense very late and close to the trial, too late for a timely notice of alibi.

---

[6] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). The Honorable Glenn H. Yamahiro presided over Wood's postconviction proceedings. We refer to Judge Yamahiro as the postconviction court.

Counsel testified that he sought a plea in the middle of trial after Melanie's testimony because Wood was less culpable than Jordan, and Wood's testimony could help the State. Trial counsel denied threatening to withdraw as counsel if Wood did not take the plea.

¶27 The defense then called Wood's girlfriend, who testified that Wood stayed over with her on the night of December 6, and that they had since broken up. During cross-examination, she testified that Wood went to bed with her and he was there in the morning. She did not know what Wood did after she was asleep—if he went to sleep or if he stayed up to watch television or play video games. During redirect examination, Wood's girlfriend testified that she typically would have noticed if Wood got up in the middle of the night and she did not remember that happening that night.

¶28 Wood testified that his first attorney investigated his alibi defense with his girlfriend. Wood stated that his first attorney wanted him to cooperate with the State, but he refused because he did not commit the crime. Wood discussed a second investigative report in which his mother claimed he was with a girlfriend by another name and that she made him give up a dog that night because of allergies, none of which were true. Wood testified that he told trial counsel about his alibi from the first day they talked in November 2016. He recalled his relationship with trial counsel as "difficult" and that counsel did not pursue additional information to bolster his alibi defense, perhaps through his use of a gaming system at his girlfriend's house. Wood stated that trial counsel told him that if they filed a notice of alibi, the inaccurate report from his mother would also have to be turned over to the State. He wrote a letter to trial counsel on February 10, 2017, because the trial was approaching but a notice of alibi had not been filed.

11

¶29    Wood testified that he agreed to move forward without the alibi defense because he was afraid that trial counsel would give the State both alibi reports and that would damage his defense. Wood stated that trial counsel pushed him to enter a plea after Melanie's testimony. He described trial counsel as hostile and he felt he did not have a choice. Wood testified that he wanted trial counsel to withdraw when he learned that counsel had previously represented Jordan.

¶30    During cross-examination, Wood testified that his testimony at trial was a lie, based on the discovery in the case and the testimony he had heard during the trial. He testified that he lied during his plea colloquy with the circuit court.

¶31    The postconviction court denied Wood's motion for plea withdrawal in an oral ruling in October 2022. The court concluded that it was clear that Wood lied at some point in the proceedings—either to the police in the debriefing or on the witness stand—and that damaged his credibility in postconviction proceedings. The court found that trial counsel had a "remarkably poor memory" of his representation of Wood. The court found trial counsel deficient for failing to file a notice of alibi because it was clear that Wood wanted to litigate the alibi and the evidence of the alibi investigated by Wood's first attorney had been transferred to trial counsel months before the trial. The court found that Wood's assertion that trial counsel threatened him by referencing sharing both alibi statements with the State was not credible. The court found that trial counsel did not have a trial strategy and that the record reflected no reason to believe Melanie would not testify. The court was not convinced that trial counsel coerced Wood into accepting the plea.

¶32    The postconviction court found credible Wood's girlfriend's testimony about the alibi; however, the alibi itself had limited strength because she

could not verify Wood's whereabouts the entire night. The court concluded it was significant that Wood and trial counsel discussed the plea shortly after Melanie testified. The court noted that the circuit court extensively questioned Wood on whether he wanted to abandon the alibi defense and whether he wanted to enter a plea.

¶33 The postconviction court concluded that Wood had not shown a reasonable probability that he would not have pled guilty and would have continued the trial if not for trial counsel's deficient performance. The court found that Wood's debriefing statement undercut his alibi and he would have had to face that confession on any retrial of the case. The court concluded that Wood failed to make a showing of prejudice because he understood the impact of Melanie's testimony and agreed with trial counsel about the need to "mitigate his culpability."

¶34 Wood now appeals.

## DISCUSSION

¶35 Wood argues that it would be a manifest injustice if he were not permitted to withdraw his plea due to the ineffective assistance of trial counsel.[7] "To withdraw a guilty plea after sentencing, a defendant must show by clear and convincing evidence that a refusal to allow withdrawal of the plea would result in

---

[7] Wood's postconviction motion also argued that his successor counsel was ineffective for failing to pursue plea withdrawal prior to sentencing. The postconviction court found successor counsel more credible than Wood. Wood did not pursue this claim in this appeal. We decline to address this issue further because "an issue raised in the trial court, but not raised on appeal, is deemed abandoned." *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998).

manifest injustice, that is, that there are 'serious questions affecting the fundamental integrity of the plea.'" *State v. Dillard*, 2014 WI 123, ¶36, 358 Wis. 2d 543, 859 N.W.2d 44 (quoting *State v. Denk*, 2008 WI 130, ¶71, 315 Wis. 2d 5, 758 N.W.2d 775). "A defendant can establish manifest injustice by proving that he or she received ineffective assistance of counsel." *State v. Jeninga*, 2019 WI App 14, ¶11, 386 Wis. 2d 336, 925 N.W.2d 574.

¶36 To succeed on a claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test in *Strickland v. Washington*, 466 U.S. 668, 687 (1984): deficient performance and prejudice to the defense. To show deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice in a plea withdrawal context, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). The reviewing court need not address both inquiries if a defendant fails to make a showing on one of them. *Strickland*, 466 U.S. at 697.

¶37 A claim of ineffective assistance of counsel presents a mixed question of fact and law. *State v. Carter*, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695. We will uphold the circuit court's findings of fact unless clearly erroneous. *Id.* "The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law," which we independently review. *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93.

¶38     The State argued and the postconviction court found that trial counsel's performance was deficient for failing to file a notice of alibi. We agree. For this appeal, the State argues that Wood's claim fails because he has not made the requisite showing of prejudice. As the deficiency prong of the ineffectiveness test is not in dispute, we focus our attention on prejudice. *Strickland*, 466 U.S. at 697.

¶39     Wood argues that he has made a showing of prejudice. He asserts that if trial counsel had filed a notice of alibi, he would not have entered the plea. *See Hill*, 474 U.S. at 59. He therefore argues that he has proven both the deficiency and prejudice prongs to establish he received ineffective assistance of counsel. *Strickland*, 466 U.S. at 687.

¶40     Wood argues this case is similar to *State v. Cooks*, 2006 WI App 262, 297 Wis. 2d 633, 726 N.W.2d 322. There, this court concluded Cooks's trial counsel was ineffective for failing to investigate and call several alibi witnesses because "[t]he State's case against Cooks was less than airtight and additional alibi witnesses could have added substance and credibility to Cooks'[s] testimony that he was at his mother's house on the night the crime was committed." *Id.*, ¶2. However, Wood's reliance on *Cooks* is misplaced because the case is distinguished by the strength of the State's case against Wood and the timing of his plea—after Melanie's testimony and with cooperating co-defendant Webb's testimony still to come.

¶41     When assessing the prejudice from deficient performance by counsel, we consider both the State's and Wood's cases. *See id.*, ¶¶54-55. The State's case here was amply supported by Melanie's thorough testimony and the corroborating testimony and evidence from MPD, MFD, and medical

professionals. The record reflects that Melanie identified Wood as a person who punched her, held her at gunpoint, bound her, and generally aided Jordan in his conduct that almost led to her death. Although Wood's postconviction position is that he had an alibi, he does not argue that trial counsel failed to dispute Melanie's identification of Wood. Additionally, Wood entered his plea before Webb, the cooperating co-defendant took the stand.

¶42 In contrast, Wood's alibi from his girlfriend was not unassailable. During the ***Machner*** hearing, she admitted that she did not know where Wood was while she was sleeping, beginning around 9:30 to 10 p.m., which is relevant for the timing of Melanie's assault, for which the 911 call came in after 2:00 a.m. While it is true that his girlfriend's testimony might have added "substance and credibility" to his alibi, ***Washington v. Smith***, 219 F.3d 620, 634 (7th Cir. 2000), Wood cannot show that his own testimony and his girlfriend's testimony would make it physically impossible for him to commit the crime, a deciding factor in the prejudice analysis in ***Cooks***, 297 Wis. 2d 633, ¶63.

¶43 Further, if Wood were permitted to withdraw his plea and proceed to trial with an alibi defense, his defense is now compromised by his own testimony. As the postconviction court noted, Wood had to have lied at some point because of the inconsistency between his police debriefing and his trial testimony. While his trial testimony breached his plea agreement by not testifying in accordance with his police interview, it was also barely consistent with his alibi. Further, Wood agreed that the circuit court could rely upon the criminal complaint and the trial testimony as the factual basis for his plea. Therefore, his limited alibi with his girlfriend would not overcome the "factual basis on the record" that the circuit court established in the plea colloquy. ***State v. Thomas***, 2000 WI 13, ¶21, 232 Wis. 2d 714, 605 N.W.2d 836.

¶44 We conclude that Wood has failed to prove prejudice from trial counsel's deficient performance. *Strickland*, 466 U.S. at 694. He failed to prove that he would not have entered the plea if trial counsel had filed the notice of alibi. *See Hill*, 474 U.S. at 59. Therefore, we conclude that Wood's claim of ineffective assistance of counsel fails. *Strickland*, 466 U.S. at 697. Accordingly, we conclude that Wood has failed to prove a manifest injustice if he was not permitted to withdraw his plea. *Dillard*, 358 Wis. 2d 543, ¶36.

## CONCLUSION

¶45 For the reasons stated above, we affirm the judgment of conviction and the order denying plea withdrawal.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.